# In the United States Court of Federal Claims

No. 16-999C
(Filed: August 24, 2017)

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

| | |
|---|---|
| THE HANOVER INSURANCE COMPANY, | |
| *Plaintiff*, | Equitable Subrogation; Wrongful Disbursement; Breach of Stakeholder Duty. |
| v. | |
| UNITED STATES, | |
| *Defendant.* | |

\* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \* \*

*Eric H. Loeffler*, Boston, MA, for plaintiff.

*Vito S. Solitro*, United States Department of Justice, Civil Division, Washington, DC, with whom were *Claudia Burke*, Assistant Director, *Chad A. Readler*, Acting Assistant Attorney General, and *Robert E. Kirschman, Jr.*, Director, for defendant.

OPINION

Bruggink, Judge.

In its amended complaint, plaintiff, Hanover Insurance Company ("Hanover"), seeks to recover $440,000 from the United States on a theory of equitable subrogation. Hanover executed payment and performance bonds on behalf of its principal, B&J Multi Service Corporation ("B&J"), in connection with a contract between B&J and the Department of Veterans Affairs ("VA") to repair the steam system at a VA facility in West Haven, Connecticut. Plaintiff contends that it notified the VA of a default by B&J, triggering its right to be equitably subrogated to B&J's right to the contract balance. Defendant moved to dismiss pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), arguing that Hanover's complaint is deficient as a matter of law because it does not allege that plaintiff put the VA on notice of B&J's default until after the contract balance had been

paid to B&J. Oral argument was held on May 2, 2017. As part of the briefing on defendant's motion, both parties submitted materials outside of the complaint. The court therefore converted defendant's motion to dismiss to one for summary judgment pursuant to RCFC 56 and afforded the parties an opportunity to submit supplemental materials to further support their positions. Supplemental briefing is now complete. Because defendant has not established that Hanover failed to give notice of default, defendant's motion must be denied.

FACTUAL BACKGROUND

The following facts are undisputed. On August 4, 2009, B&J and the VA entered into Contract No. VA241-C-1241 ("West Haven Contract"), pursuant to which B&J was to provide tools, labor, materials and equipment to repair the steam system at a VA facility in West Haven, Connecticut. As required by the West Haven Contract, B&J separately contracted with Hanover on August 20, 2009, to provide performance and payment bonds in support of B&J in the amount of $2,505,000.

Shortly thereafter, B&J commenced work but was suspended by the VA on February 17, 2010, for walking off the site, not paying subcontractors, and incorrectly certifying that subcontractors were being paid. During the course of the West Haven Contract, a number of B&J's subcontractors and suppliers made claims against Hanover's payment bonds.

On December 22, 2010, Hanover forwarded to the VA a fully executed assignment and direction of the contract funds from B&J to Hanover, but with respect to a contract not at issue here:

> . . . B&J Multi Service Corp. . . . does hereby assign, transfer and set over to Hanover Insurance Group . . . all of the Principal's right, title, and interest in and to any and all payments . . . and retainage . . . any other money now due or hereafter to become due, arising out of [the contract] . . . .

Pl's. Suppl. Br., Ex. A. That assignment was acknowledged by John Zizik of the VA, who noted that, "I am in receipt of your Notice of Assignment. I'll be working this week on determining payment and change order requests."

On February 2, 2011, Hanover informed the VA by email that it had

been "writing large checks" to "ensure that the work for your project (West Haven Contract) is being performed without disruption." Pl's. Resp. to Mot. for Summ. J., Ex. A.  In an email exchange on May 9, 2011, between Ms. Ruggiero, a contracting officer for the VA, and Mr. McDevitt, counsel for Hanover, Ms. Ruggiero stated that she had a "basis for termination for default" of the West Haven Contract.  Pl's. Supp. Br., Ex. D.  On August 3, 2011, Mr. Zizik, another contracting officer for the VA, sent an email to a subcontractor on the West Haven project, NG Environmental Contractors, directing it to address payment issues with Hanover.  On August 11, 2011, another subcontractor, EnviroMed, emailed Hanover's Mr. McDevitt to assert a claim against the surety, on which Mr. Zizik was copied.  On March 7, 2012, the VA terminated the West Haven Contract for convenience.

On February 23, 2013, the VA copied Hanover on an email containing its response to B&J's settlement proposal for termination for convenience costs.  Hanover responded on February 25, 2013, instructing the VA that "[n]o monies are to be paid to B&J.  If this matter is resolved, all payments will be to Hanover."  Pl's. Resp. to Mot. for Summ. J., Ex. B.  On May 7, 2013, the VA agreed with B&J to pay it $440,000 to settle all of B&J's claims under the West Haven Contract.

On June 4, 2013, Ms. Ruggiero emailed Hanover's counsel, Eric Loeffler, notifying Hanover of the settlement with B&J and inquiring whether payment was to go directly to the surety.  Mr. Loeffler replied to the email saying that he is "doubtful of the authority of B&J to enter into such agreement, given Hanover's equitable and contractual rights as surety" and again requested that funds not be released to B&J without Hanover's written consent.  Pl's. Resp. to Mot. for Summ. J., Ex. C.  Ms. Ruggiero then emailed B&J employees on June 6, 2013, stating that she still had "an issue to resolve with the bonding company requesting payment directly to them."  *Id.* Ex. D.  Several weeks later, after learning of further communications between B&J and the VA, Hanover reminded the VA by letter, dated June 25, 2013, of its subrogation claim.  The relevant portion of the June 25 letter is set out below:

> This firm represents Hanover Insurance Group which issued the above referenced bond, as surety, on behalf of [B&J], principal . . . .  Hanover was recently contacted by B&J about the status of the final negotiated payment due under the contract, and I understand you may have been in communication with B&J about the documents required to close-out the contract such that

3

> the final negotiated payment can be processed. For the reasons set forth below, it is important that Hanover be involved in that process. Please give me a call at your earliest convenience to discuss.
>
> Also, I wish to reiterate Hanover's demand that no further contract funds, either earned, unearned or retained, or settlement proceeds, be released to B&J or any other person or entity without the express written consent and direction of Hanover. Hanover has received claims and incurred losses against the . . . bond, as well as other bonds issued by Hanover on behalf of B&J. Pursuant to Hanover's common law rights of equitable subrogation, its perfected security interest, along with Hanover's express assignment and trust fund rights as set forth in a written Agreement of Indemnity between Hanover and B&J, Hanover owns and/or otherwise has a priority interest to the funds.

Am. Compl., Ex. 3.

Despite Hanover's communications with the VA, the agency paid B&J $440,000 on September 10, 2013. Defs. Mot. for Summ. J., Ex. 1. On September 17, 2013, counsel for Hanover sent a certified letter to the CO demanding payment of the $440,000, stating that "B&J is in default of the Bonds." Am. Compl., Ex. 4. Having already made the final payment on the West Haven Contract, the VA refused. Hanover filed suit here on August 12, 2016, seeking to recover the amount of the contract close-out payment, which it alleges was wrongfully paid to B&J in violation of plaintiff's rights as an equitably subrogated surety.

## DISCUSSION

Even in the absence of contractual privity between the United States and a surety provider, a legally enforceable duty can arise between the government and a surety if the surety notifies the government that its principal is in default of the bond agreement. *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1164 (Fed. Cir. 1985). At that point, the government must take "reasonable steps to determine for itself that the contractor had the capacity and intention to complete the job." *Id.* Defendant's motion puts into question whether Hanover's pre-payment communications with the VA adequately notified the government of B&J's default, thereby triggering the government's

equitable subrogation duty to Hanover. As we explain below, we find that the surety's letter of June 25, 2013 adequately notified the government of the contractor's default.

The theory of equitable subrogation "is based on the view that the triggering of a surety's bond obligation gives rise to an implied assignment of rights by operation of law whereby the surety 'is subrogated to the [principal obligor's] property rights in the contract balance.'" *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1312 (Fed. Cir. 2011) (quoting *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1164 (Fed. Cir. 1985)). Those rights do not arise vis-a-vis the government, however, unless the surety notifies the government of the default. The law in this regard is succinctly summarized by the Federal Circuit's decision in *Fireman's Fund Insurance Co. v. United States*:

> [T]he government as obligee owes no equitable duty to a surety like Fireman's Fund unless the surety notifies the government that the principal has defaulted under the bond. It is irrelevant whether the surety claims a right to funds during performance of the contract, or after it is completed when the government functions as a 'stakeholder' of funds owed but not yet paid. In either event, notice by the surety is essential before any governmental duty exists.

909 F.2d 495, 498 (Fed. Cir. 1990). In *Fireman's Fund*, although subcontractors and suppliers informed the government that they had not been paid by the contractor, that did not satisfy the surety's requirement to give notice and therefore it did not trigger the government's equitable duty towards Fireman's Fund. *Id.* at 499.

Defendant's argument here can be reduced to one point: Hanover did not invoke the precise words "the principal is in default" prior to the VA's payment to B&J. Defendant principally cites *Firemen's Fund* in support.

Notice of a potential default can also be sufficient to trigger the Government's obligation to protect the interests of the surety in remaining contract funds. *Ins. Co. of W. v. United States*, 83 Fed. Cl. 535, 541 (2008). In *Hartford Fire Insurance Co. v. United States*, the court stated that the Government's equitable subrogation duty can arise when "the surety notifies the government that the contractor has defaulted or *is in danger of defaulting*

equitable subrogation duty to Hanover. As we explain below, we find that the surety's letter of June 25, 2013 adequately notified the government of the contractor's default.

The theory of equitable subrogation "is based on the view that the triggering of a surety's bond obligation gives rise to an implied assignment of rights by operation of law whereby the surety 'is subrogated to the [principal obligor's] property rights in the contract balance.'" *Lumbermens Mut. Cas. Co. v. United States*, 654 F.3d 1305, 1312 (Fed. Cir. 2011) (quoting *Balboa Ins. Co. v. United States*, 775 F.2d 1158, 1164 (Fed. Cir. 1985)). Those rights do not arise vis-a-vis the government, however, unless the surety notifies the government of the default. The law in this regard is succinctly summarized by the Federal Circuit's decision in *Fireman's Fund Insurance Co. v. United States*:

> [T]he government as obligee owes no equitable duty to a surety like Fireman's Fund unless the surety notifies the government that the principal has defaulted under the bond. It is irrelevant whether the surety claims a right to funds during performance of the contract, or after it is completed when the government functions as a 'stakeholder' of funds owed but not yet paid. In either event, notice by the surety is essential before any governmental duty exists.

909 F.2d 495, 498 (Fed. Cir. 1990). In *Fireman's Fund*, although subcontractors and suppliers informed the government that they had not been paid by the contractor, that did not satisfy the surety's requirement to give notice and therefore it did not trigger the government's equitable duty towards Fireman's Fund. *Id.* at 499.

Defendant's argument here can be reduced to one point: Hanover did not invoke the precise words "the principal is in default" prior to the VA's payment to B&J. Defendant principally cites *Firemen's Fund* in support.

Notice of a potential default can also be sufficient to trigger the Government's obligation to protect the interests of the surety in remaining contract funds. *Ins. Co. of W. v. United States*, 83 Fed. Cl. 535, 541 (2008). In *Hartford Fire Insurance Co. v. United States*, the court stated that the Government's equitable subrogation duty can arise when "the surety notifies the government that the contractor has defaulted or *is in danger of defaulting*

*under the bond*." 40 Fed.Cl. 520, 522–23 (1998) (emphasis added), *aff'd*, 185 F.3d 885 (Fed. Cir. 1999); *see also Capitol Indem. Corp. v. United States* 71 Fed. Cl. 98, 102–03 (2006) (stating that "a payment bond surety must notify the government that the contractor is or is close to being in default," and later stating that "the surety must explicitly notify the government of the default or threatened default"). Thus the notice requirement cannot be as explicit as defendant would have it.

Hanover's June 25, 2013 letter was adequate to put the agency on notice of default. Hanover informed the VA that it had made payments under its payment bond and that it was therefore exercising its equitable subrogation rights. It is not too much to assume that the VA should have understood this as tantamount to saying that the principal had defaulted. Under these circumstances, Hanover's invocation of its "rights of equitable subrogation" could mean only one thing: the surety was invoking its legal right to payment because it had incurred costs due to the principal's default.

Under the case law in this circuit, the language of the June 25 letter is sufficient to put the government on notice that the principal has defaulted and the surety has been called upon to perform under its bond obligations. In *Lumbermens Mutual*, for example, the circuit court makes it clear that notice similar to that furnished here would be sufficient: "The Claims Court dismissed Lumbermens' 'equitable subrogation' claim here because, before the payments were made, Lumbermens 'did not notify the Government was approaching default or that the Navy should withhold or divert progress payments.' We agree." 654 F.3d at 1309 (internal citations omitted). The implication is that notice to the government that it should not make progress payments to the principal would be sufficient to trigger the surety's rights as an equitable subrogee and the government's duties to it.

Similarly, in *American Fidelity Fire Insurance Co. v. United States,* 513 F.2d 1375 (Ct. Cl. 1975), the Court of Claims held that the government became a stakeholder when the surety there notified it that,

> In reference to the above captioned matter and pursuant to that General Agreement of Indemnity as between Fidelity Fire Insurance Company and [contractor], a copy of which is attached hereto, and further pursuant to California Code of Civil Procedure, Section 2847, 2848, and 2849, please consider this letter formal demand that any monies due under the above

6

captioned contract be forthwith distributed to and placed with American Fidelity Fire Insurance Company.

*Id.* at 1377 n.1. The word "default" was not present in that notice. The court pointed out that the references to the California Code were only relevant if the principal on the bond had failed to pay laborers and materialmen. "None of the sections has any application unless there is a defaulting principal or one who is about to default. Once there is a default by the principal, the sections provide in surety's favor suitable rights, including subrogation." *Id.* at 1380. The court thus rejected the government's argument that the notice from the surety was insufficient to trigger its equitable subrogation rights. *Id.* at 1380-81.

Hanover's letter in this case was more pointed than the notices in either *American Fidelity* or *Lumbermens' Mutual* and certainly would have satisfied the test set out in *Fireman's Fund*, where the circuit court faulted the surety for not notifying the government of "Westech's failure to pay its subcontractors or suppliers or ask that payments to Westech be withheld until December 22, 1983, almost five months after the government had fully released the retainage . . . ." 909 F.2d at 499. In *Balboa*, the court treated notice that the principal "was in financial straits and would not be able to fulfill its payment and performance obligations" as tantamount to asserting that the contractor breached by defaulting under one of the bonds. 775 F.2d at 1160, 1164. In light of this precedent, we hold the notice here to have been sufficient.

In sum, in view of the evidence indicating that the agency paid the principal in the face of notice of the principal's bond default, we cannot grant summary judgment for the government against the surety.

## CONCLUSION

The parties agree that the court has before it all the materials it needs to resolve defendant's converted motion for summary judgment. Because defendant has not established that plaintiff failed to notify defendant of B&J's default, the motion is denied. The parties are directed to consult and propose by September 8, 2017, in a status report, their recommendations for further proceedings.

s/Eric G. Bruggink
ERIC G. BRUGGINK
Senior Judge